IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT BECKLEY

DARRELL FINT,

    Plaintiff,

v.                                                           Civil Action No.: 5:17-CV-04043
                                                                  Judge Berger

BRAYMAN CONSTRUCTION
CORPORATION, a foreign corporation,

    Defendant.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO SET
REASONABLE EXPERT WITNESS RATES**

       Now comes the Plaintiff, Darrell Fint, by and through his counsel, Christopher J. Heavens and Aaron M. Kidd of Heavens Law Firm, PLLC, and James D. McQueen of McQueen Davis, PLLC, for Plaintiff's Response to Defendant's Motion to Set Reasonable Expert Witness Rates. The Plaintiff respectfully request that this Honorable Court deny Defendant's motion, require the Defendant to compensate Plaintiff's expert at his reasonable rates, and to grant any other relief the Court deems appropriate.

       The Court should note at the outset that Defendant's position in this matter has evolved. First, Defendant attempted to get the Plaintiff to pay for the deposition of his own expert, Stephen Petty, when Plaintiff asked for payment following Mr. Petty's deposition. Second, Defendant requested an itemized bill from Mr. Petty. Third, when Mr. Petty provided an itemized bill, Defendant then filed a motion seeking to reimburse Mr. Petty at $275 per hour, which is completely arbitrary, unfair and unreasonable. The evolution of Defendant's position evidences a lack of integrity, given the fact that Defendant was presented with Mr. Petty's fee schedule at his deposition and Defendant knew his hourly rate was $385 when the deposition commenced.

## Introduction to Liability Expert Issues and Evidence

The issue before the Court is the reasonableness of deposition rates and fees of Plaintiff's expert, Stephen Petty. Mr. Petty was deposed by Defendant on July 20, 2018 and provided Defense counsel with his fee schedule and hourly rate at the deposition. SEE: Fee Schedule, attached as **Exhibit A**. Defense counsel did not question the reasonableness of Mr. Petty's fees at his deposition. Mr. Petty's hourly rate of $385 is like that of Defendant's expert, James Stanley, who charges $375.

Before addressing the fee issue, Plaintiff will provide the Court with evidence pertaining to the work of the two experts. Mr. Petty has opined, consistent with the admissions of wrongdoing by Defendant in its OSHA Rapid Response document, that Defendant violated well-recognized industry safety standards by failing to barricade an open 9-foot-deep hole at Defendant's work site, resulting in the Plaintiff falling into the hole and breaking his neck. SEE: Defendant's Rapid Response document, attached as **Exhibit B**. Because Defendant filed its OSHA Rapid Response document admitting violations of well-recognized industry safety standards, it was forced to retain its expert, James Stanley, to offer opinions that contradict Defendant's own admissions. From the standpoint of expert credibility, it is unquestionable that Mr. Petty offers a fact-based common-sense assessment consistent with Defendant's OSHA Rapid Response Admissions, whereas Mr. Stanley is forced to twist and contort himself to come up with a narrative that seeks to explain away Defendant's admissions.

Mr. Stanley's opinions are not only contradicted by Defendant's OSHA Rapid Response filing, but also contradicted by the testimony of Defendant's own site safety manager, Thomas Moore, who testified that Defendant violated one of the OSHA standards (29 CFR 11926.501 (b)(7)(ii)) that Mr. Petty identified in his report. SEE: Moore transcript at P. 54, L. 18-25, P. 55, L. 1-25, attached as **Exhibit C**. Additionally, Defendant's company safety director, Jody Porterfield, testified that it was "unacceptable" for Defendant to have left the subject hole un-barricaded at the time of Plaintiff's injury. SEE: Porterfield transcript at P. 46, L. 24-25, P. 47, L. 1-17, and P. 58, L. 5-17, attached as **Exhibit D**. Mr. Porterfield oversaw company-wide safety for Defendant and Mr. Moore oversaw

2

safety at the subject work site, and they both agree with the Plaintiff and his expert, Stephen Petty.

Thomas Moore testified that he had given the workers at the site orders to <u>not begin</u> work until the cattle guards (safety devices) arrived at the work site, which was scheduled for February 2, 2017. <u>SEE</u>: Moore transcript at P. 22, L. 8-25 and P. 23, L. 1, attached as **Exhibit E**. Mr. Moore testified that he gave such orders for "safety reasons" to prevent exactly what happened to the Plaintiff. <u>SEE</u>: Moore transcript at P. 26, L. 1-10. Attached as **Exhibit F**. When Mr. Moore heard about the Plaintiff's injury on January 30, 2017, he saw it as a major problem because he knew that the men had disregarded his instruction. <u>SEE</u>: Moore transcript at P. 19, L. 18-25, P. 20, L. 1-7, attached as **Exhibit G**. It was learned in discovery that site superintendent, Walt Parker, had contacted Defendant's company superintendent, Chad Linamen, on January 29, 2017, to advise Mr. Linamen that cattle guards were not at the work site and that Mr. Linamen authorized work to commence without the cattle guards. <u>SEE</u>: Parker transcript at P.10, L. 21-25, P. 11, L. 1-13, 21-25, P. 12, L. 1-23, P. 17 L. 9-25, and P. 18 L. 1-9, attached as **Exhibit H**. Company management usurped the authority of its own site safety manager, instructing workers on the ground to disregard the site safety manager's directive

During his deposition, Mr. Moore reviewed the Defendant's OSHA Rapid Response document and testified that the two violations to which Defendant admitted were accurate. On first violation "Procedures/job safety analysis not followed," Mr. Moore testified that if on January 30-31, cattle guards were not listed on the job safety analysis (JSA), the job should not have been commenced. Mr. Moore testified that the reason that the job should not have been commenced without cattle guards listed on the JSA is because of concern for the safety of the workers. <u>SEE</u>: Moore transcript at P. 44, L. 3-19, attached as **Exhibit I**. On second violation, "Insufficient planning for installation of protective systems," Mr. Moore testified that the failure to make sure that cattle guards were at the work site at the commencement of work on January 30, 2017, was the factual basis for this violation, and that site superintendent, Walt Parker, should not have permitted work to commence without the cattle guards on site. <u>SEE</u>: Moore transcript at P. 44, L. 22-25, P. 45, L. 1-17, attached as **Exhibit J.** Mr. Moore was asked if he believed

3

that the Plaintiff was morally justified in his liability position against Defendant and Mr. Moore said, "yes." SEE: Moore transcript at P. 68, L. 14-17, attached as **Exhibit K**.

The fact that Defendant's company superintendent in Saxonburg, Pennsylvania, Mr. Linamen, authorized the site superintendent, Mr. Parker, to commence work without cattle guards present, over the orders of site safety manager Thomas Moore, is not surprising, since Mr. Linamen has testified that he disagreed with the OSHA Rapid Response admissions and believes that cattle guards were not necessary at the subject work site. SEE: Linamen transcript at P. 27, L. 16-17, P. 32, L. 25 and P. 33 L. 1-6, attached as **Exhibit L**. The above-cited evidence establishes that the Defendant's management team in Saxonburg, Pennsylvania, knew of the lack of cattle guards (safety devices) at the work site, but ordered the work to commence anyway, over the orders of its own site safety manager, Thomas Moore.

## The Five-Factor Test

The five factors necessary to establish a claim under Section 23-4-2(d)(2)(B), require proof of the following:

(1) the existence of a specific unsafe working condition that presented a high degree of risk and a strong probability of serious injury or death;

In the instant case, the un-barricaded hole presented a high degree of risk and strong probability of serious injury or death. Plaintiff was seriously injured.

(2) that the employer, pre-injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;

In the instant case, Thomas Moore's testimony establishes that Defendant had actual knowledge of the existence of the specific unsafe working condition. Mr. Moore gave orders that the work was not to commence until cattle guards arrived at the work site, but Defendant's management personnel overrode his directive.

> (3) that the specific unsafe working condition was a violation of a state or federal safety statute, rule, or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer;

Defendant filed an OSHA Rapid Response document admitting to violating the safety statutes, rules or regulations identified by Plaintiff's expert, Stephen Petty, in his report. Defendant's site safety manager, Thomas Moore, testified that the Defendant violated 29 CFR 11926.501 (b)(7)(ii)) by failing to barricade the subject hole. SEE: **Exhibit C**.

> (4) that notwithstanding the existence of each of the above-referenced facts, the person or persons alleged to have actual knowledge intentionally thereafter exposed the employee to the specific unsafe working condition; and

Thomas Moore testified that the Defendant knew the safety devices were not at the work site and that they were required to be at the work site before work commenced. Defendant's management overrode the directive of Mr. Moore and intentionally exposed workers to the very hazard that Mr. Moore sought to eliminate.

> (5) that the employee suffered serious compensable injury or compensable death as a direct and proximate result of the specific unsafe working condition.

Plaintiff suffered a broken neck.

**Fee Dispute Raised by Defendant**

Stephen Petty traveled from Florida to Ohio to make the taking of his deposition more convenient. Mr. Petty provided his fee schedule to Defendant at his deposition and no questions were asked of him concerning the basis for his flat rates or hourly rate. Following his deposition, Defendant refused to pay Mr. Petty, insisting that Plaintiff pay Mr. Petty. When Plaintiff refused to do so citing the Rules of Civil Procedure, Defendant rejected Mr. Petty's bill, asking for the bill to be itemized and re-submitted. After the itemized bill was sent to Defendant, it was rejected as unreasonable. Defendant then filed a brief with the Court seeking to impose a $275 hourly rate on Mr. Petty. This conduct by Defendant contravenes custom and practice, and all notions of fairness.

Defendant filed a Notice of Deposition of Stephen Petty, P.E., C.I.H., C.S.P. who is the Plaintiff's expert witness in this matter. The deposition took place on July 20, 2018 at Mr. Petty's office in Dublin, Ohio. SEE: Stephen Petty Deposition Transcript, attached hereto as **Exhibit M**. To save on defense costs, Mr. Petty offered for counsel to use his office building for the deposition, which saved defense counsel from having to reserve a hotel conference room. On July 20, 2018, at Mr. Petty's deposition, Plaintiff's counsel furnished Mr. Petty's fee schedule (hourly rates and fixed rates for deposition and trial testimony), along with a copy of his curriculum vitae. SEE: Petty Fee Schedule, attached as **Exhibit A**. The deposition of Mr. Petty lasted approximately five (5) hours. During his deposition, Mr. Petty told Defense counsel that his hourly rate was $385.00 per hour for non-deposition and non-trial work. SEE: Page 94 lines 20-21 of **Exhibit M**.

On August 8, 2018, Plaintiff sent the Defendant Mr. Petty's invoice in the amount of $5,000.00, the flat rate that is stated on Mr. Petty's fee schedule that was provided to Defendant's legal counsel at Mr. Petty's deposition. Defense counsel did not remit payment for Mr. Petty's deposition at the deposition or within a reasonable time thereafter. Plaintiff's counsel sent defense counsel an e-mail to inquire about payment for Mr. Petty's deposition and a series of e-mails followed. SEE: E-mail to Wendy Greve and Responses, attached hereto as **Exhibit N**. The initial e-mail asked if Wendy Greve, counsel for defense, had paid Mr. Petty's bill. In response, Ms. Greve sent an e-mail stating: "No – do you want to pay jim stanleys? I thought we were going to take care of our own experts." SEE: **Exhibit O**.

Plaintiff's counsel had no understanding at any time during this or any other litigation that parties would pay for their own expert's to be deposed by the opposition. This is contrary to the language of Federal Rule 26, which states that the party seeking discovery from another party is responsible for that expert witness's deposition fees. Plaintiff's counsel responded in the following fashion: "We would have paid for the opposing expert deposition, as we have done for as long as I have been practicing law. Did you submit the bill to us?" SEE: **Exhibit P**. In response, Wendy Greve wrote the following: "No but if that is how you prefer to proceed we will forward." On September 4, 2018, the Defendant, for the first time, communicated to Plaintiff's counsel that the

invoice was unacceptable because it "…did not reflect the time or work by Mr. Petty." SEE: **Exhibit Q**. Plaintiff then submitted an itemized bill to Defendant on September 13, 2018, which was rejected by Defendant. SEE: Itemized Bill, attached as **Exhibit R**.

The conduct of Defendant is fundamentally unfair. Defendant never questioned the fee schedule or hourly rate of Mr. Petty at his deposition. Following the deposition, Defendant attempted to impermissibly get Plaintiff to pay to have his own expert deposed. Now Defendant takes the unreasonable position that Mr. Petty should not only be denied his flat deposition rate (something defense counsel's own experts charge), but also that Mr. Petty should be required to accept a lower hourly rate, arbitrarily set by Defense counsel.

## Legal Authority

Rule 26(b)(4)(E) provides that "[u]nless manifest injustice would result, the court must require that the party seeking discovery: pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) or (D); and for discovery under (D), also pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions." Fed. R. Civ. P. 26(b)(4)(E)(i)-(ii). Rule 26(b)(4)(A) permits a party to "depose any person who has been identified as an expert whose opinions may be presented at trial." Fed.R.Civ.P. 26(b)(4)(A).

"The party seeking reimbursement bears the burden of showing the requested fees and expenses are reasonable." First South Bank v. Fifth Third Bank, N.A., 2014 U.S. Dist. LEXIS 108070*7-8 (2014) (citations omitted). It is ultimately within the Court's discretion to set an amount for payment that it deems reasonable. Id. (citing Fleming v. United States, 205 F.R.D. 188, 189 (W.D.Va. 2000)). When determining a reasonable fee for expert witness testimony, federal courts have typically considered the following factors:

> (1) the witness's area of expertise, (2) the education and training that is required to provide the [expert insight that is sought, (3) the prevailing rates for other comparably respected available experts, (4) the nature, quality and complexity of the discovery responses provided, (5) the cost of living in the particular geographic area, (6) the fee being charged by the expert to the party who retained him, (7) fees traditionally charged by the expert on related matters, and (8) any other factor likely to be of assistance to the court

7

in balancing the interests implicated by Rule 26.

Ordonez v. AMS, Inc., 2017 U.S. Dist. LEXIS 41812 * 7-8 (2017) (citations omitted).

Mr. Petty's areas of expertise are far broader and more credentialed than Defendant's expert, Mr. Stanley. The breadth of his education and training is far broader than that of Mr. Stanley. His rates are those of other comparable respected available experts. The nature, quality and complexity of his discovery responses is unparalleled in this case, as reflected in his highly-detailed reports. SEE: Report and Supplemental Report, attached as **Exhibit S** and **Exhibit T**. The cost of living in Ohio and Florida, where Mr. Petty works, is the same or higher than that of West Virginia. The fee that Mr. Petty is charging Defendant is the same that he charges parties who retain him, and it is the same as he charges in all other matters. Another issue for the Court to consider is that Mr. Petty has authored a textbook on safety, entitled Forensic Engineering: Damage Assessments for Residential and Commercial Structures. Also of note, Mr. Petty was a critical expert witness for plaintiffs in the successful Dupont C8 litigation, having testified in court for days and having been subjected to rigorous cross examination by some of the best lawyers in the country.

This Court addressed the issue of expert witness fees in 2016, Fulks v. Allstate. Fulks v. Allstate Prop. & Cas. Ins. Co., No. 3:14-cv-29473, 2016 U.S. Dist. LEXIS 14152 (S.D. W. Va. Feb. 4, 2016). In Fulks, which related to a dispute arising over expert witness depositions, this Court recognized that Federal Rule of Civil Procedure 26(b)(4)(A) provides for a party to depose "any person who has been identified as an expert whose opinions may be presented at trial." The opinion continued by analyzing the committee notes to this rule, and according to those notes to Rule 26(b), by 1993, depositions of expert witnesses had become the norm in most courts. See Fed. R. Civ. P. 26(b) advisory committee notes to 1993 amendment. The Court continued by stating that the rule was amended to clarify that expert witnesses would be subject to deposition prior to trial. At the same time, the rule on compensation of experts was amended to take into account the expense involved in deposing experts. **The advisory committee acknowledged concerns that freely allowing depositions would increase the costs associated with retaining expert witnesses, but explained that these concerns would be mitigated, in part, by requiring the expert's deposition fee to be borne by the**

**party requesting the deposition**. Id. Rule 26(b)(4)(E)(i) continued this remedy, stating that "unless manifest injustice would result," the court must require that the party seeking discovery under Rule 26(b)(4)(A) pay the expert "a reasonable fee for time spent in responding to discovery." In other words, the applicable federal rule presumes a temporary fee-shifting; the fee is shifted to the party requesting the expert's deposition, rather than the party that retained the expert, and is temporally limited to the time the expert spends responding to the discovery posed by the requesting party.

### Legal Position of Plaintiff

At his deposition, Stephen Petty provided counsel for defense with a copy of his retention agreement/fee schedule. SEE: **Exhibit A.** This contained his $3,000 and $5,000 flat rate for depositions, as well as his $385 per hour rate. On the transcript, Mr. Petty informed Ms. Greve, counsel for Defendant, that he charges $385 per hour. SEE: Stephen Petty Deposition Transcript, attached hereto as **Exhibit M**. In its brief, Defendant attacks the qualifications/credibility of Mr. Petty and conflates his compensation terms between report preparation and deposition/trial testimony. In an e-mail, Defense counsel, Wendy Greve, stated "Jim Stanley charges $375 an hour. Your witness, Petty's only workplace occupational safety qualification is a certificate that he obtained on-line. The only additional training he had was a test preparation course to get that certificate. Please refer to his deposition testimony in confirmation of this. To imply that he should command the same rate as Jim Stanley is preposterous." SEE: E-mail from Wendy Greve to Chris Heavens, attached hereto as **Exhibit U**.

If Defendant is looking for something that is "preposterous," it is the suggestion that Mr. Petty's credentials are from a mail order or online service. Mr. Petty's certifications of CIH (i.e. his CIH (http://www.abih.org/about-abih/cih-caih), CSP, (https://www.bcsp.org/csp), & PE (https://www.nspe.org/resources/licensure/what-pe) all require rigorous background checks and the successful completion of written examinations. Defendant's criticism of Mr. Petty's credentials evidences a gross misunderstanding of safety certifications and credentials. In response to Defendant's criticism, Plaintiff presents to this Court a copy of an affidavit signed by Mr. Petty, which demonstrates his extensive experience in the field of industrial safety and details some of

the cases in which he has been instrumental in advancing worker and environmental safety. SEE: Petty Affidavit, attached hereto as **Exhibit V**. Mr. Petty is a highly respected, knowledgeable expert whose results speak for themselves.

Both specialty certifications that Mr. Petty possesses required him to pass two eight (8) hour exams after being qualified based on years of education, training and experience. These are not trivial exams, and these are not obtained by simply taking an online class. Mr. Petty underwent a three (3) week refresher course at the University of Michigan and a two (2) week AIHA refresher course. He studied for more than a year for both the CIH and CSP certifications after meeting the experience requirements. Very few experts in the United States possess both certifications.

It is not the desire of Plaintiff to belittle Mr. Stanley's credentials, but Mr. Stanley clearly lacks the safety credentials of Mr. Petty. Mr. Stanley has no certifications, whereas Mr. Petty has four (4) significant certifications (PE, CIH, CSP and Asbestos) requiring rigorous testing. Putting credentials aside for a moment, Mr. Stanley's credibility in the instant case is highly suspect. He is charging $375 per hour to offer opinions that contradict the position that the Defendant took when filing its OSHA Rapid Response document, and that contradict the testimony of the Defendant's company safety director, Mr. Porterfield, and site safety manager, Mr. Moore.

Mr. Petty's hourly report preparation fee/rate and fees/rates for deposition and trial testimony have been in place for all cases billed since January 2016, and he has not had any legal challenges to those. That said, defense counsel should not have proceeded with the deposition of Mr. Petty if they felt that his rates were not reasonable. Using the Fulks analysis above, logic dictates that defense counsel bears the burden of considering rates and fees before conducting depositions of expert witnesses. For defense counsel to wait almost a month after his deposition and then engage in a series of ham-handed tactics to avoid paying the expert his reasonable fee/rate is fundamentally unfair. If Defendant had been operating from a position of integrity, Defendant would have insisted on imposing a $275 hourly rate from the outset, instead of initially attempting to get the Plaintiff to pay for Mr. Petty's deposition and then, having failed, asking the Plaintiff to submit an itemized invoice. It was only after being strung along by Defendant

through a series of hoops artificially created by Defendant that Defendant finally stated that it was not going to pay even the stated hourly rate of Mr. Petty. As for the use of a flat rate by an expert witness, this is standard in the field. For example, one of the Defendant's experts, Deborah Frost, charges a flat rate for depositions. SEE: Letter from Deborah Frost, attached hereto as **Exhibit W**.

As stated herein above, Defendant's position has evolved in a way that lacks integrity. Plaintiff has reasonably attempted to provide Defendant with everything that was requested, only to be rebuffed at the end with an arbitrary offer of $275 per hour to compensate Mr. Petty. If Defendant's position was that Mr. Petty was only entitled to $275 per hour, one must ask why the Defendant required the Plaintiff to jump through so many hoops to get this point. The Court should not reward bad faith conduct of a party in these disputes. The Court should require Defendant to pay Mr. Petty's flat rate of $5,000, as set forth in the fee schedule that he provided to Defendant at his deposition.

**Conclusion**

WHEREFORE, the Plaintiff, Darrell Fint, by and through his counsel, Christopher J. Heavens and Aaron M. Kidd of Heavens Law Firm, PLLC, and James D. McQueen of McQueen Davis, PLLC, for Plaintiff's Response to Defendant's Motion to Set Reasonable Expert Witness Rates. The Plaintiff respectfully request that this Honorable Court deny Defendant's motion, require Defendant to pay Mr. Petty's deposition rate and to grant any other relief the Court deems appropriate.



/s/ *Christopher J. Heavens, Esq.*
Of Counsel for Plaintiff

**HEAVENS LAW FIRM, PLLC**
Christopher J. Heavens (WV Bar No.: 5776)
Aaron M. Kidd (WV Bar No.: 13213)
2438 Kanawha Boulevard East
Charleston, West Virginia 25311
Phone:     304-346-0464
Fax:       304-345-5775
e-mail:    chris@heavenslawfirm.com
           aaron@heavenslawfirm.com

and

James D. McQueen, Jr. (WV Bar No. 2507)
**MCQUEEN DAVIS, PLLC**
Century Bldg., Suite 200
314 Ninth Street
Huntington, West Virginia 25701
Phone:	304-522-1344
Fax:	304-522-1345
e-mail:	jmcqueen@mcqueendavis.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT BECKLEY

DARRELL FINT,

    Plaintiff,

v.                                          Civil Action No.: 5:17-CV-04043
                                                  Judge Berger

BRAYMAN CONSTRUCTION
CORPORATION, a foreign corporation,

    Defendant.

## CERTIFICATE OF SERVICE

      The undersigned, of counsel for plaintiff, does hereby certify that on October 10th, 2018, I electronically filed the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO SET REASONABLE EXPERT WITNESS RATES** with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following CM/ECF participants.

        Wendy E. Greve
        Pullin, Fowler Flanagan,
          Brown & Poe PLLC
        James Mark Building
        901 Quarrier Street
        Charleston, WV  25301
        *Counsel for the Defendant*

                                                         /s/ Christopher J. Heavens
                                  Christopher J. Heavens (WV Bar No. 5776)
                                  Aaron M. Kidd (WV Bar No. 13213)
                                  **HEAVENS LAW FIRM, PLLC**
                                  2438 Kanawha Boulevard, East
                                  Post Office Box 3711
                                  Charleston, West Virginia 25337
                                  Phone:     (304) 346-0464
                                  Fax:       (304) 345-5775
                                  e-mail:    chris@heavenslawfirm.com
                                                    aaron@heavenslawfirm.com

and

James D. McQueen, Jr. (WV Bar No. 2507)
**MCQUEEN DAVIS, PLLC**
Century Bldg., Suite 200
314 Ninth Street
Huntington, West Virginia 25701
Phone: 304-522-1344
Fax: 304-522-1345
e-mail: jmcqueen@mcqueendavis.com